722 So.2d 9 (1998)
J.B. TALLEY & CO., INC., Plaintiff-Appellee,
v.
VILARET CONSTRUCTION SERVICES INC. and International Fidelity Insurance Company, Defendant-Appellant.
No. 98-395.
Court of Appeal of Louisiana, Third Circuit.
October 7, 1998.
Rehearing Denied January 7, 1999.
*10 Paul Joseph McMahon, III, Esq., Lafayette, for J.B. Talley and Co., Inc.
Lindsey James Leavoy, Esq., Baton Rouge, for Vilaret Const. Services, Inc., et al.
Herman C. Hoffmann, Jr., Esq., New Orleans, for Intern. Fidelity Ins. Co.
Robert W. Fenet, Baton rouge, for The Fidelity & Deposit Co. of Maryland.
Before DOUCET, C.J., and GREMILLION and PICKETT, JJ.
DOUCET, Chief Judge.
This appeal arises out of the dismissal of a subcontractor by the general contractor on a state highway construction project.
In late 1994 or early 1995, Vilaret Construction Services, Inc. (Vilaret) was awarded a state highway construction contract on State Project No. 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-FAP, Project No. 3RS-256-2(004) Junction La. 1097 Junction La. 98 Bridge. Vilaret subcontracted with J.B. Talley and Co., Inc. (Talley) for performance of part of the construction.
Part of Talley's work involved replacing a bridge with concrete box culverts. Talley was to divert the existing water course and prepare a bed for the culverts. By April 19, 1995, Talley built a diversion canal and a dam. It excavated the bed and laid down a limestone base for the culverts. On April 19, 1995, heavy rain caused the dam to break and flooded the construction site. On April 21, 1995, Vilaret acting through its president, Jos Gonzales, sent Talley a letter terminating their subcontract. Vilaret then completed the work subcontracted to Talley.
Talley filed this suit alleging wrongful termination and seeking to recover its actual expenses on the job and the profit it would have made had it finished the job. Made defendants were Vilaret and International Fidelity Insurance Company, who issued a contract retainage bond insuring payment to those furnishing labor and/or materials to the project. Vilaret filed a reconventional demand to recover the difference between the amount bid for the subcontract and the amount it had to spend to complete the work. Named defendants in reconvention were Talley and Fidelity & Deposit Company of Maryland, Inc., who issued a bond insuring Talley's performance of its subcontract. The court rendered judgment dismissing Talley's claims on the main demand and dismissing Vilaret's claims on the reconventional demand. Vilaret appeals. Talley has answered the appeal.
TALLEY'S CLAIM
Talley contends that the trial court erred in denying its claims for improper termination and for sums due and owed under *11 the subcontract. Talley argues that the breach of the dam was not sufficient cause for its dismissal. The question of whether Talley's performance was so defective as to allow its dismissal is one of fact. Therefore, we must review the trial court's determination using a manifest error standard of review. The trial court outlined the reasons for its determination in this regard as follows:
First, the Court finds J.B. Talley and Co., Inc. did breach its obligation to complete the work in a workmanlike manner. There is ample evidence that the problems with the diversion canal were directly related to poor construction. Furthermore, after numerous warnings from DOTD and Vilaret representatives, no remedial action was attempted other than to repair the breaches. The job was behind schedule. By Talley's own admission, its job foreman, a Mr. Leger, was not properly performing his job. The Court notes that delay damages were not assessed by DOTD; however, the "Silver Book" does provide for it.
After reviewing the evidence elicited at trial, we conclude that it is susceptible of more than one interpretation. The testimony of record reflects the following facts: William J. Oliver, a project engineer with the State of Louisiana, Department of Transportation and Development (DOTD) testified concerning the Mire project. He stated that he handles contract management of construction projects in Acadia Parish. DOTD inspectors who oversee the work on various projects report to him. On the Mire project, the DOTD inspectors were Doucet and Richard. Their job was to oversee the work on the project, make sure that everything was done according to the plans and specifications, record when work was completed, keep a tally of quantities and report to Oliver orally and in writing. Oliver recalled that Vilaret was the first company on the site. Vilaret removed a bridge and cleared some brush. Talley moved onto the site on approximately April 7, 1995. He stated that the work for Talley included diverting the existing water course by damming both sides of the channel, building a diversion canal, excavating the existing channel and using an excavator to place bedding material for the box culverts which were to come later. He testified that the DOTD has no specification for the construction of such temporary dams or diversion canals and that the method of construction is left to the discretion of the contractor doing the actual work. Oliver further stated that there were many problems with the diversion including seeping and breakagehe stated that the dam broke on three occasions, including the April 19 incident. The project was behind schedule. Doucet and Richard reported to him that the dams were not constructed according to normal standards. They further reported that, although warned, Talley failed to bring the dam up to normal standard because Talley's project manager, Lawrence Leger, thought the construction was adequate. Oliver testified that he received the impression that the inspectors felt that it was not adequate. Oliver stated that on April 19,1995, he received a call from Richard. Richard reported that the filter cloth under the bedding material was torn and that there had been no attempt to repair it. According to Oliver, the DOTD requires repair of a torn filter cloth. Talley's refusal to repair it would constitute an infraction requiring action from him or his inspectors. However, the dam broke before they could take action concerning the filter cloth. Oliver testified that he was on the phone with Jos Gonzales when the word came in that the dam had broken. That afternoon Oliver heard from Ray Franks, superintendent on the project for Talley. A meeting was held the next day to discuss the problem. Present were Oliver, Doucet, Richard, Jack Gremillion and Kevin Fontenot from Talley, and Franks, Bernie Young and another person from Vilaret. Oliver testified that Talley's representatives agreed that the dam was their problem and agreed to correct the problem. Oliver testified that Franks stated at the meeting that Talley would develop a plan to correct the problem, get back to him and go on with the project. Later that day, Oliver was informed that Talley had removed Lawrence Leger from the project. On Friday, April 21, 1995, Oliver received a call from Gonzales, who felt something should be done to get the project moving forward. Talley had not contacted Gonzales regarding *12 the dam breaking and this concerned him. In testimony, Oliver opined that failing to contact the general contractor for that long a period after a situation this serious is not normal for a subcontractor. Oliver reported that Gonzales called him again later that day and stated that he would give Talley until Monday to go on with the project and, if Talley did nothing by Monday, Vilaret would assume Talley's responsibilities and do the work. Oliver opined that the situation could not have been improved before Monday because the water was too high. Oliver testified that when he went to the project on Monday, April 24, 1995 at about 10:00 a.m., Vilaret was there and had cut the dam on the downstream side to relieve the flooding.
Also testifying was Claude Clements, the manager of operations for Vilaret. He was in charge of all field operations for construction. He testified that his duties included going out into the field and looking at the various projects and discussing them with the field supervisors. They would call him if they had problems and he would work to get them fixed. If necessary, he would go to the job site and stay there until the problem was solved. The field supervisors reported to him on a daily basis. He stated that Bernie Young was on the Mire job site daily, sometimes dividing his time between that project and the Rayne project, which was seven miles down the road. His first involvement with the Mire project was when the job was laid out after the contract was signed. Clements opined that before the dam break of April 19, 1995, Talley had finished about 10% of their contract work. He felt that there were problems with the dam and diversion canal. Clements testified that he felt the diversion canal was too small. He stated that, in building the diversion canal, Talley used two twenty-four-inch pipes stacked one on top of the other. Clements stated that the bottom pipe quickly became plugged with trash and debris that came down the channel. This, he stated, restricted the flow of water through the canal. He stated that the water level had to be four feet high before it could reach the upper pipe. Clements testified that he suggested to Leger that something be done to improve the situation, but that Leger felt it would hold until they got done. He stated that he spoke to Leger about the dam a couple of times. He also testified that Young was concerned about the situation and had spoken to Leger about it also, without effect. Clements testified that both Young and the state inspectors were concerned that the dams were not properly constructed. Clements stated that he first spoke to Leger about the dam approximately a week before the April 19, 1995 break. He felt the dam should be compacted and that material should be added because water coming down the channel would wash it away. He thought it was already being washed away and was plugging the lower pipe as a result. Clements stated that he asked Leger if Talley intended to do this. Clements testified that he last spoke to Leger the morning of April 19. When he went to the job site that day there was a two-inch crack in the dam. He called Leger and pointed it out but Leger said not to worry about it, he would take care of it later. He stated that when he came back to the job site close to lunch time with Young, Oliver and the inspectors, the crack had widened to six inches. Clements stated that he then returned to Baton Rouge and told Gonzales what he had seen.
He testified that Gonzales called Oliver but Oliver got another call while they were talking. Oliver called back a short time later to report that the dam had broken. He testified that both he and Young recommended terminating Talley based on their past performance. He further testified that Talley could have started repairing the damage on Thursday, April 20, by removing the debris that was plugging the diversion canal and, thus, speeding drainage of the site. He admitted that the DOTD has no specification for building dams and/or diversion canals and that the method of building these items is generally left to the discretion of the contractor building them.
Kevin Fontenot also testified. At the time the Mire project was under way, Talley employed Fontenot as a Project Manager Superintendent. Additionally, he testified that he owns land next to the same waterway that flooded the project. He stated that the area has a strong tendency to flood in wet weather; the water comes up fast and goes down *13 slowly. He testified that his first involvement in the Mire project came on April 20, 1995, when he went with Gremillion to a meeting on the site to inspect the flood damage. He stated that it was discussed at the meeting, and in the presence of the state's representatives, that Talley would fire Leger from the job. He further stated that the stance at the meeting was that nothing could be done on the site until the water went down. He agreed that it is important, on such a project, to make sure that the dam is as sound as you can make it. However, he stated that it is common in South Louisiana for temporary dams to get washed out. It is, he testified, the duty of the project manager to check water levels. He stated that, if he were doing a similar job, he would have begun the dam, and before totally holding the water back, he would watch the forecast. He testified that he customarily considers how much water travels through the area to be diverted before he starts a project. He opined that it would take approximately a day and a half to excavate, put down the filter cloth and lay the bed for the culverts.
John L. "Jack" Gremillion, president of Talley at the time of trial, was general manager in April 1995. At trial he testified as follows: On April 19,1995, he got a call from Franks saying that the dam had broken. Franks told him that a meeting was being scheduled for the next day, April 20. Gremillion went to the meeting bringing Kevin Fontenot with him because Fontenot had extensive bridge experience and Gremillion felt he would have good knowledge of how to assess the problem and correct it. Gremillion stated that, at the meeting, he acknowledged that it was Talley's problem and stated that after the water went down they would attack the problem and get the site back to where they could finish laying the bedding material for the culverts. Further, he decided then to replace Leger as job foreman. He testified that Vilaret's representative, Bernie Young, did not disagree with what they were going to do. He received a termination letter on Friday, April 21, 1995. He had not received any previous correspondence from Vilaret regarding problems on the site. After receiving the termination letter, he met with Gonzales to discuss the situation. When Gonzales held to his position, Gremillion asked about payment for money already spent by Talley. He testified that Gonzales told him to send a bill for his consideration. He stated that, had they not been terminated, Talley would have put the situation right, but that Vilaret did not give them adequate time to do the work.
Given this evidence, we cannot say the trial judge erred in concluding that Vilaret had sufficient cause to terminate Talley's contract. The trial judge apparently credited the testimony that indicated that the breach of the dam was not an isolated incident but that there was a history of uncorrected problems with the dam and diversion canal.
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.
Rosell v. ESCO, 549 So.2d 840, 844 (La.1989) (citations omitted).
Having found no manifest error in the trial court's determination that Talley's performance was defective, we conclude that the trial court correctly refused to award Talley anticipated profits. However, we must decide whether the court correctly denied payment of out-of-pocket expenses. In this regard the trial judge stated that:

*14 Talley could, however, collect its actual expenses if it proves its efforts benefited the job and Vilaret's eventual completion of the project. I find it did not. Furthermore, even if Talley had benefited the project, this was offset by the need to repair the breach, clear debris and provide additional base material to replace that which was compromised.
The Court recognizes there was testimony that breaches of diversion canal banks was (sic) not that unusual. However, in this case the breach was caused by poor design.
Finding sufficient evidentiary support of record, we affirm the trial court's ruling in this regard.

EVIDENTIARY RULINGS
Vilaret argues that the trial court erred in excluding certain evidence. Talley objected to the evidence as irrelevant and the trial court sustained that objection.
Relevant evidence means evidence that has any tendency to make the existence of any fact that is of consequence to the litigation more probable or less probable than it would be without the evidence. La.Code Evid. art. 401. "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. Evidence which is not relevant is not admissible." La.Code Evid. art. 402. Whether evidence is relevant is within the discretion of the trial court and that ruling will not be disturbed by an appellate court in the absence of a clear abuse of discretion. Belle Pass Terminal, Inc. v. John, Inc., 92-1544, 92-1545 (La.App. 1 Cir. 3/11/94), 634 So.2d 466, writ denied, 94-0906 (La.6/17/94), 638 So.2d 1094; Dubois v. State, Through Department of Public Safety, 466 So.2d 1381 (La.App. 3 Cir.1985).
Hawthorne v. Hawthorne, 96-89, p. 7 (La. App. 3 Cir. 5/22/96); 676 So.2d 619, 623, writ denied, 96-1650 (La.10/25/96); 681 So.2d 365.
Vilaret now argues that the evidence would impeach the credibility of Jack Gremillion by showing that Gremillion was working for Talley while he was still in Vilaret's employ and preparing the bid on the Mire project. Vilaret further argues that it would show that as an employee of Talley, Gremillion underbid the project to the detriment of Vilaret. After reviewing the matter, we find no error in the trial court's ruling. Even if the proffered testimony is as Vilaret suggests, we find nothing in it that would tend to disprove Gremillion's testimony on any point which would influence the outcome of this case. We find nothing in the Defendant's portrayal of the proffered evidence that tends to show relevance to Talley's failure to perform its contract work properly or to Vilaret's claim for damages. Accordingly, we will not overturn the trial court's ruling on this point.

VILARET'S DAMAGES
Vilaret asserts that the trial court erred in failing to award it damages after finding that Talley's work was defective.
It appears that the trial court denied Vilaret's claim for damages first because Vilaret failed to show which damages resulted from Talley's breach and which from Capital's breach; and because Vilaret failed to mitigate its damages.
A court is not justified in fixing damages in the absence of definite proof. The plaintiff has the burden of proving the damage suffered by him as a result of the breach of contract. In a breach of contract action, the plaintiff is entitled to recover the amount of loss he has sustained and the profit of which he has been deprived. LSA-C.C. art.1934. While the absence of independent, corroborating evidence may not be fatal to the plaintiff's burden of proof, the lack of even a minimal degree of detail or specificity as to the extent of loss precludes an award. Casadaban v. Bel Chemical & Supply Company, Inc., 322 So.2d 854 (La.App. 1st Cir. 1975). Speculation and conjecture cannot be accepted as a basis for fixing loss of earnings or profits. Jones v. Rodgers, 179 So.2d 674 (La.App. 2d Cir.1965).
Campbell v. Lelong Trust, 327 So.2d 533, 536 (La.App. 2 Cir.), writ denied, 331 So.2d 494, 496 (La.1976). See also Johnson v. Eagle Steel Structures, 497 So.2d 54 (La.App. 3 Cir.1986).
*15 Vilaret offered evidence of damages through the testimony of Claude Clements. However, this evidence was brought into question upon cross-examination when it was revealed that expenses claimed to have been caused by Talley's breach were also included in a claim against Capital Concrete, the supplier of the culverts. Additionally, the cross-examination of Clements brought into question some labor costs claimed by Vilaret. Further, there was evidence that problems with the culverts significantly delayed the project. There was, additionally, testimony that the amount of damages claimed by Vilaret was not reasonable for the size of the job. The trial court in its written reasons for judgment stated that:
Vilaret claims it incurred actual construction costs of $289,102.06 to complete Talley's portion of the job, and seeks the amount of $161,892.16 in damages (actual cost less the subcontract price).
While Talley does not dispute that additional mon[ies] were spent, it does strongly urge that many of the cost overruns were due to problems with box culverts supplied by Capital Concrete Products, Inc. Talley produced evidence that a claim for overages was pending against that company as well. Many back charges were duplicated in both claims.
While the Court makes no determination that Vilaret was attempting to "double dip", it does note many consistencies in the extra charges submitted to both Talley and Capital. Examples of this practice can be found by comparing the daily reports of extra work for weeks pending 7/30/95 and 8/13/95, which were submitted to both Talley and Capital.
Under those circumstances, Vilaret has not been able to convince the Court with any measure of probability that the extra expenses resulted from Talley's breach of contract.
As these statements indicate, the trial judge did not believe that the damages suffered resulted from Talley's breach of the contract. "An `appellate court should not disturb such a finding of fact unless it is clearly wrong.' Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978)." Fontenot v. Memphis Farms, Inc., 445 So.2d 197, 199 (La.App. 3 Cir.1984). After reviewing the evidence, we cannot say the trial court's finding in this regard was clearly wrong. Having so found, we find no need to consider whether Vilaret failed to mitigate its damages.

PERFORMANCE BONDS
Having found no merit in the claims for damages of either Talley or Vilaret, we need not consider any claims against the bonding agents/insurers of either.

CONCLUSION
For these reasons, we affirm the judgment of the trial court. Costs of this appeal are to be divided equally between Talley and Vilaret.
AFFIRMED.