# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-135

**ALFRIEDA ONEZIME MASON**

**VERSUS**

**SHELTER MUTUAL INSURANCE COMPANY**

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20117387
HONORABLE KRISTIAN DENNIS EARLES, DISTRICT JUDGE

**********

## SYLVIA R. COOKS
### JUDGE

**********

Court composed of Sylvia R. Cooks, John D. Saunders, Marc T. Amy, Phyllis M. Keaty and D. Kent Savoie, Judges.

**AFFIRMED IN PART; REVERSED IN PART AND RENDERED; MOTION TO REMAND DENIED.**

**Amy, J., concurs in part, dissents in part, and assigns reasons.**

**J. Lomax Jordan, Jr.**
**1817 West University Avenue**
**Lafayette, LA 70506**
**(337) 233-9984**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Alfrieda Onezime Mason**

**Thomas R. Hightower, III**
**Post Office Drawer 51288**
**Lafayette, LA 70505**
**(337) 233-0555**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Shelter Mutual Insurance Company**

**COOKS, Judge.**

The plaintiff, Alfrieda Onezime Mason, pursued recovery from her homeowner's insurer, Shelter Marine Insurance Company, after her home sustained water damage. Although the insurer offered coverage for the event, it rejected the plaintiff's demand for various items, including plumbing costs associated with broken plumbing and remediation costs necessitated by the presence of flooring found to contain asbestos. The plaintiff filed this matter, seeking damages as well as penalties and attorney fees. Following trial, the trial court awarded the plaintiff repair costs, as well as penalties and attorney fees. Both parties appeal.

### FACTS AND PROCEDURAL HISTORY

Ms. Mason alleges she discovered water on the floor of the kitchen and laundry room of her home on the morning of September 5, 2011. Although a plumber initially replaced the home's hot water tank,[1] the main valve to the house was turned off after Ms. Mason found that water continued to seep into the home. She contacted her homeowner's insurer, Shelter, the following day. Ms. Mason alleged in her petition that when her plumber returned on September 7, 2011, he determined "that the water was coming from a broken pipe inside the foundation slab." She further stated that Shelter's adjuster "instructed [her] to have the plumber disconnect pipes from those within the foundation and re-route the plumbing without utilizing the pipes within the foundation." Ms. Mason asserted that after the plumber did so, Shelter refused to pay for the cost of re-routing the plumbing.

Ms. Mason alleged that her home sustained "extensive water damage to floors in the utility room, kitchen, dining room, and den, which included seepage into the walls." She stated that "[t]he damaged flooring in those rooms matched

---

[1] Ms. Mason's counsel clarified at trial that the plaintiff did not seek recovery of costs associated with the water heater.

and were part of a flooring system that also ran continuously into the living room, hallway, front bathroom and closet." However, Ms. Mason asserted Shelter "has refused to pay for or reimburse the plaintiff for repairs to all such flooring[.]" Notably, the record reflects that, in some areas, three levels of linoleum flooring were atop the foundation. Testing determined that one of the levels of flooring contained asbestos. Ms. Mason alleged, however, that the insurer "refused to pay for or reimburse [her] for removal of the asbestos which would be required in order to install flooring to replace the damaged floors."

Ms. Mason asserted that, while Shelter provided certain sums, the payments "were paid in insufficient amounts, and as a result, the plaintiff has been unable to make repairs to her home, and is living in unsafe and inconvenient circumstances, causing problems with her health." Subject to sums paid by Shelter, Ms. Mason sought various costs, including those associated with: the re-routing of the plumbing; drying of the walls; abatement and removal of the flooring containing asbestos; replacement of flooring in the affected rooms; replacement of affected carpentry work; the disassembly, reassembly, and repair of a built-in entertainment center in order to dry the concrete beneath it, and "[s]uch other damages as will be shown at trial." In this latter claim, Ms. Mason sought recovery of costs associated with temporary relocation while the asbestos abatement was performed. Additionally, Ms. Mason contended that Shelter's adjustment of the claim and failure to make payment under the described circumstances warranted the imposition of penalties and attorney fees. *See* La.R.S. 22:1892; La.R.S. 22:1973.

Following a bench trial, the trial court found in favor of Ms. Mason and awarded damages as follows: $20,591.96 for net costs of repair ($27,140.00 in total damages subject to a credit for the $6,548.04 in prior payments); $2,000.00 for costs associated with the re-routing of the plumbing from the slab; $750.00 in "future additional living expenses for hotel costs incurred during the course of

3

repairs related to this claim[.]" The trial court also awarded penalties in the amount of $10,000.00 and attorney fees in the amount of $10,000.00.

Thereafter, Ms. Mason filed a "Rule Nisi Pertaining to Litigation and Court Costs, Motion for Partial New Trial on Limited Issues of Quantum of Attorney Fees Pursuant to R.S. 22:1982(B) and Quantum of Penalties Pursuant to R.S. 22:1973(C), and Incorporated Memorandum." With regard to the motion for partial new trial, Ms. Mason sought an evidentiary hearing on the issue of penalties and attorney fees. The trial court denied the Rule in all respects.[2] Both parties appeal.

Prior to filing her brief, Ms. Mason filed a "Motion to Remand And Request to Suspend Briefing Delays." While the motion to suspend briefing deadlines was denied, the motion for remand was deferred to the panel on the merits of the appeal.

In its brief, Shelter asserts that the trial court erred in: 1) awarding the full amount of estimated work since the work had not been performed; 2) awarding costs for asbestos abatement; 3) awarding the cost of the plumbing work associated with re-routing the broken water pipe; 4) awarding an amount for additional living expenses as they were not actually incurred; 5) failing to apply the $1,000.00 policy deductible to the award of costs associated with the estimate; and in 6) finding it in violation of La.R.S. 22:1892 and La.R.S. 22:1973.

---

[2] The record reflects that the trial court initially wrote the word, "denied," across the proposed order. After each party appealed, a panel of this court issued a rule to show cause why the appeals should not be dismissed as premature, citing *Egle v. Egle*, 05-0531 (La.App. 3 Cir. 2/8/06), 923 So.2d 780. In response, the parties supplemented the appellate record with an amended judgment of March 10, 2016 wherein the trial court denied the motion for new trial. Thereafter, this court determined that, pursuant to *Richard v. Lafayette Fire and Police Civil Service Board*, 07-1010 (La.App. 3 Cir. 9/19/07), 966 So.2d 685, "the March 10, 2016 amended judgment, which constitutes a proper judgment for the denial of the motion for new trial, served to cure the defect which had made the instant appeals premature." *See Alfrieda Onezime Mason v. Shelter Mutual Insurance Company*, 16-0135, p. 3 (La.App. 3 Cir. 4/6/16) (an unpublished judgment and opinion). The panel recalled the rule. *Id.*

4

In her appeal, Ms. Mason argues the trial court erred in: 1) awarding "an unreasonably low amount" of attorney fees without providing her an opportunity to present evidence; 2) failing to award the highest penalty available under La.R.S. 22:1892 and 22:1973; and in 3) failing to tax litigation costs as expenses.

**Discussion**

*Awarded Costs*

Shelter's challenges the trial court's award of costs as estimated by Ms. Mason's expert in general construction, arguing the estimate provided by its chosen contracting company was more reliable and precise as to the costs of the particular items to be repaired. Additionally, Shelter contends the trial court erred in awarding the full amount of the estimated costs as Ms. Mason had not completed the repairs as, it argues, was required by her particular policy. We will first address the policy framework.

Completion of Work

The declaration sheet of Ms. Mason's policy indicates she paid an additional premium for "Expanded Restoration Cost Coverage." Referencing that coverage, Shelter argues that the trial court erred in awarding Ms. Mason full replacement cost, despite Ms. Mason not having completed the work. Shelter contends the policy instead anticipates that only "actual cash value" is paid in advance of work performed. The policy defines "actual cash value" as "**total restoration cost** less **depreciation**"[3] and further defines "[t]otal restoration cost" as "the **restoration**

---

[3] "Depreciation" is defined by the policy as:

> an amount of money that is deducted from the amount **we** actually pay. That amount is based on the decrease in the value of the property since it was new. It applies to any part that must be **repaired** or **replaced** to allow for the **repair** or **replacement** of a damaged part, whether or not that part itself is damaged. The condition, age, extent of use, and obsolescence of the part, and the property as a whole, will be considered in determining **depreciation**. **Depreciation** also applies to the labor and applicable sales tax necessary to complete covered **repairs** and **replacements**. **We** will calculate the percentage by which the materials necessary to the **replacement** have decreased in value, based on the

**cost** of all of the damaged parts of the covered property that were damaged in one **accident**." The policy's "Amendatory Endorsement – Louisiana" defines "restoration cost," in pertinent part, as follows:

> 44. **Restoration cost** means the amount of money it will, or did, cost to restore the form and function of the damaged part of covered property with property of equivalent construction, for an equivalent use, on the same **premises** by:
>
> (a) **replacing it**; or
>
> (b) **repairing it**,
>
> whichever is less expensive.
>
> **Restoration cost** can be based on a combination of (a) and (b) above, if some parts of the covered property are **replaced** and other parts are **repaired**. **Restoration cost** includes:
>
> (a) the cost of labor using construction techniques commonly used by the building trades in the geographical area of the covered property; and
>
> (b) the cost of parts and materials of **like kind** and **like quality**, to the extent those are available in the geographical area of the covered property;
>
> **Restoration cost** does not include:
>
> . . . .
>
> (h) **general contractors' overhead and profit.**

While depreciation is accounted for within the calculation of "actual cash value," Ms. Mason's coverage included "Expanded Restoration Cost Coverage," as was noted above. Shelter's adjuster acknowledged at trial that the expanded coverage provision was applied to Ms. Mason's claim and the provision anticipates the return of the depreciation cost for various items to the insured, as well as a "general contractors' overhead and profit."[4] The adjuster testified Paragraph D

---

factors stated above, and apply that same percentage when calculating the **depreciation** applicable to the labor and sales tax.

[4] The latter item is not included in the above definition of "restoration cost."

(for the flooring) and Paragraph E (for remaining items) were considered applicable to Ms. Mason's claim. Those provisions, as relevant herein, indicate:

> (D) This provision applies to covered losses to the following items if they are permanently attached to the **residence premises**: . . . (iii) floor surfaces[.]:
>
>> (1) When **we** agree with **you** as to the **restoration cost** of the damaged part of those items, **we** will, at **our** option, do one of the following:
>>
>>> (a) pay the **actual cash value** of the damaged part of the covered property;
>>> (b) purchase replacement property of like kind and quality; or
>>> (c) pay the limit of coverage stated in this policy as applicable to the item.
>>
>> (2) No further payment will be made unless, within one year[5] of the date of the loss:

---

[5] When asked by counsel at trial whether "any time limitation" was applicable to the claim in terms of when she had to complete the work, Shelter's adjuster responded: "Yes; two (2) years from the date of the loss." We here reference the time period set forth in the policy. In any event however, Ms. Mason testified that she had not performed the work at the time of trial, explaining that she did not have the funds to perform the work.

7

(a)    all the **repairs** and **replacements** necessary to restore the form and function of the damaged part of the covered property have actually been completed; and

(b)    the **total restoration cost** is agreed upon by **you** and **us.**

**We** will then pay **you**:

(c)    the difference between the amount **we** have already paid **you** and the restoration cost of that particular part, plus

(d)    any reasonable and necessary charges **you** actually incurred for **general contractors' overhead and profit**; or

(e)    if the amount **we** have already paid **you** plus the amounts payable under (c) and, (d), immediately above, total more than the limit of liability shown in the **Declarations** applicable to the particular loss, **we** will pay **you** the difference between the amount **we** have already paid **you** and that limit of liability.

(3)    All payments made under this provision will be applied against the limits of Coverage A or B,[6] whichever may apply to the specific loss.

(4)    If **we** make a payment to **you** under this provision, **we** **may**, at **our** option take all or part of the covered item for which that payment was made.

(E)    This provision applies to covered losses to all items that are not included in sections (B), (C),[7] or (D), above:

(1)    **We** will estimate the **total restoration cost** of the damaged part of those items. Based on that estimate, **we** will estimate the **actual cash value** of the damaged part of those items and will, at **our** option, do one of the following:

(a)    pay the estimated **restoration cost** of the damaged part of the covered property;

(b)    pay the estimated actual cash value of the damaged part of the covered property;

(c)    purchase replacement property of like kind and quality; or

(d)    pay the limit of coverage stated in this policy as applicable to the item.

---

[6] Paragraph (A) pertains to consideration of the policy's deductible, whereas Paragraph (B) applies to covered losses to all **personal property**."

[7] Paragraph (C) "applies to covered losses to structures that are permanently attached to the **residence premises** but are not buildings[.]"

(2) No further payment will be made unless, within one year of the date of the loss:

    (a) all the **repairs** and **replacements** necessary to restore the form and function of the damaged part of the covered property have actually been completed; and

    (b) the **total restoration cost** is agreed upon by **you** and **us.**

**We** will then pay **you**:

    (c) the difference between the amount **we** have already paid **you** and the **restoration cost** of that particular part, plus

    (d) any reasonable and necessary charges **you** actually incurred for **general contractors' overhead and profit**; or

    (e) if the amount **we** have already paid **you** plus the amounts payable under (c) and (d), immediately above, total more than the limit of liability shown in the **Declarations** applicable to the particular loss, **we** will pay **you** the difference between the amount **we** have already paid **you** and that limit of liability.

(3) All payments made under this provision will be applied against the limits of Coverage A or B, whichever may apply to the specific loss.

(4) If **we** pay to replace an item under this provision, **we** may, at **our** option take all or part of the covered item for which that payment was made.

Thus, Shelter contends that Paragraphs D and E anticipate the return of the previously withheld depreciation amounts and the contractors' overhead and profit, but only after the repairs are completed within the prescribed time.

Louisiana Civil Code Article 2045 explains that: "Interpretation of a contract is the determination of the common intent of the parties." In the event that "the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La.Civ.Code art. 2046. "An insurance policy is a contract between the insured and insurer and has the effect of law between them." *Gorman v. City of Opelousas*, 13-1734, p. 5

9

(La. 7/1/14), 148 So.3d 888, 892. *See also* La.Civ.Code art. 1983. After review of the policy language at issue, we find no error in the trial court's ruling.

When placed within the context of Paragraphs D and E, Shelter's argument speaks to a process whereby it is working in agreement with its insured. In particular, it provides that the additional payment will be made after the completion of the work within one year "*and* [ ] the total restoration cost is agreed upon by you and us." (Emphasis added.)

However, in this case the parties disagreed as to the total restoration cost and to whether Ms. Mason's claims of asbestos abatement and re-routing of the plumbing were covered items.[8] Shelter's interpretation of the provision, under the present circumstances, would require Ms. Mason to perform and personally finance work in accordance with the policy terms, while it simultaneously denied coverage under that same policy.

We also find no merit in Shelter's suggestion that *Orleans Parish School Board v. Lexington Insurance Company*, 12-1686 (La.App. 4 Cir. 6/5/13), 118 So.3d 1203, indicates that the time limitation for repairs to property is applicable when the insured represents that it had insufficient funds to pay for the repairs. Although that case involved an insured's failure to repair property within the period specified by the subject policy, it is distinguishable because the plaintiff therein did not make a specific proof of loss within the prescribed period. Thus, the fourth circuit determined that La.Civ.Code art. 1772[9] was not applicable. In contrast, Ms. Mason made specific proofs of loss regarding the plumbing and asbestos removal claims in this matter. Yet, the claims were rejected on a

---

[8] While Shelter extended various tenders, those tenders did not represent the full amount in dispute. Central in the dispute was the parties' continued dispute regarding the plumbing and asbestos abatement issues. Thus, the parties did not reach "agreement" as to "total restoration cost."

[9] La.Civ.Code art. 1772 provides: "A condition is fulfilled when it is not fulfilled because of the fault of a party with an interest contrary to the fulfillment."

coverage basis by Shelter. Under these circumstances, we find the trial court did not err in awarding full replacement costs.

Quantum

We next address Shelter's argument that the trial court awarded an excessive sum. Each party presented estimates from their respective contracting companies as to the required work in Ms. Mason's home. Paul Doherty of Coastal Sales, Inc., accepted by the trial court as an expert in general construction, testified that Ms. Mason hired him to provide a bid on work that needed to be performed. Mr. Doherty reviewed the April 17, 2014 bid, a copy of which was introduced into evidence, explaining that it included an estimate for asbestos abatement ($5,400.00) to be performed by a subcontractor.[10] Mr. Doherty testified the abatement work would require approximately three to four days and that Ms. Mason could not be in the home during that period. He estimated that the entire repair would take three to four weeks, but that he would try to accommodate Ms. Mason during that time. However, he included the cost of an on-site storage unit for her property while the work was ongoing and explained that once the project was complete, the furniture and appliances would be reset. Mr. Doherty noted that, among other things, the bid included expenses for flooring material, the installation of the new flooring, painting, and the replacement of certain carpentry, including the removal of a built-in entertainment center. The Coastal Sales, Inc. total bid was $27,140.00, which included line items for profit ($2,360.00) and overhead ($1,180.00).

Shelter relied upon an estimate by S&S Renovators, Inc. Scott Sanders, a project manager for S&S Renovators, was permitted to offer fact testimony regarding the estimate, but was not qualified as an expert. The S&S Renovators

---

[10] In its summary, the Coastal Sales bid listed proposal items as: "on site storage unit"; "remove and reset furniture, appliances, etc"; "floor removal (asbestos tile)"; "carpentry"; "paint"; "floor install"; and "carpentry". The bid further included line items for each component of the bid.

11

bid reported a "net claim" of $11,868.05. In his explanation of the bid, Mr. Sanders noted that S&S Renovators reported measurements for the affected area, but did not include costs associated with a storage unit and the replacement of a pantry. And, while it included a subcontractor's bid for removal of "three layers of vinyl flooring including the bottom layer which is asbestos tile" ($2,303.00), Mr. Sanders reported that he did not know whether the subcontractor was certified for asbestos abatement. As stated above, Shelter denied coverage for any increased expense associated with that element.

In ruling, the trial court relied upon the Coastal Sales bid, awarding the $27,140.00 listed amount, subject to amounts previously paid. Shelter suggests that the Coastal Sales estimate was not reliable as it included items not covered by the policy, was predicated upon imprecise measurements, and included only general information regarding subcontractor and material estimates. It also suggests that the estimate included for the storage unit was provided without adequate consideration of whether furniture and appliances could be moved to other areas of the home while work was underway. Finally, Shelter notes the Coastal Sales bid included $5,400.00 for asbestos abatement, but that Ms. Mason presented additional testimony from an expert in asbestos abatement who offered an estimate of $4,395.00 for that work. These factors, Shelter asserts, rendered the Coastal Sales figure unreliable.

The supreme court has explained that a trial court's finding of fact may not be reversed in the absence of manifest error or unless it is clearly wrong. *Snider v. Louisiana Med. Mut. Ins. Co.*, 14-1964 (La. 5/5/15), 169 So.3d 319. In the event "there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous." *Watkins v. Lake Charles Mem'l Hosp.*, 13-1137, p. 24 (La. 3/25/14), 144 So.3d 944, 961. If those findings are based on determinations regarding the credibility of witnesses, the manifest error standard

12

requires great deference to the findings of fact. *Id.* "Indeed, where the factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous. This rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony." *Id.*

Applying that standard, we find no merit in Shelter's contention that the trial court erred in relying on Ms. Mason's evidence. While the Coastal Sales estimate did not offer the type of specificity as that offered by S&S Renovators, it was rendered by an expert in general construction able to provide opinion testimony as to the project's needs. In addition to the fact that the Coastal Sales estimate included costs for certified asbestos abatement, it also included items such as the storage unit that the trial court could have found reasonable under the circumstances. In contrast, the S&S Renovators estimate was presented by a project supervisor who was unable to express the type of opinion testimony offered by Mr. Doherty. Further, the Coastal Sales estimate was generated in 2014, with Mr. Doherty explaining that labor costs had increased since the 2014 bid. We also note that the S&S Renovators was generated in 2011, whereas Mr. Doherty explained that he had observed an increase in labor costs between 2011 and the time of the August 2015 trial. Finding the trial court's determination as to fact and credibility reasonable, we will not disturb that ruling.

*Asbestos Abatement*

Shelter next argues its policy did not cover additional expenses associated with the removal and abatement of the asbestos flooring tile found in Ms. Mason's home. Thus, it contends the trial court erred in awarding those expenses rather than the lesser flooring removal expenses estimated in the S&S Renovators bid, which did not account for those costs. Shelter references the policy exclusions as follows:

EXCLUSIONS APPLICABLE TO COVERAGES A & B

**We** do not cover any loss or damage if it would not have occurred in the absence of any event or condition listed below. . . .

. . . .

1.   Enforcement of any ordinance or law regulating the construction, use, repair or demolition of a building or other structure. This exclusion includes the increased costs incurred to comply with an ordinance or law. **We** do cover loss caused by actions of civil authorities to prevent the spread of a fire, if that fire is caused by a peril **we** insure against.

Shelter points out that both the testimony of Ms. Mason's expert in asbestos abatement, Raul Viera, and his written estimates indicate that removal of the subject tiles would require compliance with state and federal regulations.[11] Mr. Viera confirmed that removal of non-asbestos-containing material is less expensive than the removal of asbestos-containing material and explained some of the additional procedures and safeguards that are required in the latter instance. Similarly, Shelter notes that Ms. Mason's estimates regarding the cost of the asbestos-compliant work were significantly higher than that offered by S&S Renovators.

We find no error in the trial court's award of damages in this regard.[12] In *Haas v. Audubon Indemnity Co.*, 98-566 (La.App. 3 Cir. 10/21/98), 722 So.2d

---

[11] The "Project Understanding" sections of Mr. Viera's October 2011 and April 2014 estimates indicate that:

> There is a ~ 735 sq. ft. of single (1) layer ACM floor tile & mastic material overlain by two (2) layers of non-ACM flooring in the Kitchen, Dining, Living Rm, Utility Rm, Hallway, and Bathroom of the house located at 209 Lita Dr., in Lafayette, Louisiana, that needs to be removed in compliance with state and federal regulations.

The "Scope of Work" aspect of the evaluations reported, in part, that: "Pelican Environmental Services will provide the labor, materials and equipment to abate and dispose of the ACM described above from the subject residence in accordance with 29 CFR 1910.1001, 1926.58, and LAC 33:III-5151-5103-5107 guidelines."

[12] In oral reasons for ruling, the trial court stated that:

> And then the asbestos removal. I mean, countless times people have testified in here that the purpose of the policy was to put them back [] whole. I haven't seen anything that request [sic] anything but you being put back whole, which means scrape up the old floor, put back the new floor. The way I see that limitation in the policy about laws that

14

1022, *writ granted in part*, *writ denied in part*, 98-2885 (La. 2/5/99), 737 So.2d 736,[13] this court considered a matter in which a vacant commercial building sustained significant damage due to vandalism and related flooding of the premises. As here, the insurer in *Haas* rejected the insured's claim for the additional cost for the removal of asbestos-containing flooring. The insurer cited a portion of its policy that excluded damage caused by "[t]he enforcement of any ordinance or law" that regulated the construction, use or repair of the premises.[14] *Id.* at 1028. This court rejected that claim, observing that the removal of the asbestos-containing matter did not result from an enforcement of a regulation. *Id.* Rather, "[t]he costs of asbestos abatement were necessary because of the flooding which arose out of the vandalism to the building." *Id.* at 1029. *See also Royal Cloud Nine, LLC v. Lafayette Ins. Co.*, 08-0034 (La.App. 4 Cir. 6/11/08), 987 So.2d 355, *writ denied*, 08-1551 (La. 10/10/08), 993 So.2d 1286, *writ denied*, 08-

_____

require increased costs is just like the case you quoted me where the whole building has to rewired [sic]. Some wiring gets messed up and then now Shelter would have to pay for the whole building to be rewired. In this case the floor got messed up right here. Shelter's not going to have to pay for the whole house to be asbestos abated, but the floor where it got messed up where the damage occurred to be asbestos related. So, we're not shifting the burden onto Shelter to cause them to have to redo the whole house, we're shifting the burden on them to undo and fix the floor to put them back whole. And so that's my reasoning on that.

[13] While the supreme court granted the writ in part to amend the judgment to delete the award of penalties and attorney fees in the case, the insurer's writ application was otherwise denied.

[14] As excerpted in *Haas*, 722 So.2d at 1028, the pertinent exclusion in that case provided:

**B. EXCLUSIONS**

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence of loss.

   a. Ordinance or law.

   The *enforcement of any ordinance or law:*

   (1) Regulating the construction, use or repair of any property; or

   (2) Requiring the tearing down of any property, including the cost of removing its debris.

(Emphasis added.)

1568 (La. 10/10/08), 993 So.2d 1287 (wherein the fourth circuit determined that an ordinance or law exclusion did not preclude payment of the increased costs of a slate roof required by the Vieux Carre Commission for the insured historic property damaged by Hurricane Katrina. Rather, the fourth circuit observed that the hurricane caused the damage to the roof, not the enforcement of the Commission's requirements). Similarly, in this case, the costs necessitated in the flooring's removal clearly resulted from the plumbing failure. It did not result from the "enforcement of any ordinance or law" regulating the repair as is required for application of the exclusion. Instead, and was the case in *Haas*, the insured's demand in this case involves the need to comply with pertinent construction requirements.

The present instance of compliance differs from the factual situations presented in the jurisprudence cited by Shelter. Ordinance and law exclusions were found applicable in both *Sweeney v. City of Shreveport*, 584 So.2d 1248 (La.App. 2 Cir.), *writ denied*, 589 So.2d 1057 (La.1991) and *Estopinal v. Parish of St. Bernard*, 09-1382 (La.App. 4 Cir. 2/24/10), 32 So.3d 991. However, both of those cases involved homes alleged to have been improperly demolished pursuant to the respective governing bodies' attempts to enforce ordinances regarding demolition of property. Thus, the insureds in those cases sought damages stemming from the "enforcement" of those ordinances. Ms. Mason contrarily seeks damages incurred from the plumbing malfunction and the related damage to her house. The increased repair amount relates only to compliance with applicable law. The trial court properly awarded the additional expenses associated with the removal and abatement of the asbestos flooring tile.

16

*Plumbing Costs*

Shelter next challenges the trial court's awarding of costs associated with the re-routing of the plumbing, arguing the policy excludes that coverage as follows:

EXCLUSIONS APPLICABLE TO COVERAGES A & B

**We** do not cover any loss or damage if it would not have occurred in the absence of any event or condition listed below. . . .

. . . .

10.    Wear and tear; marring or scratching; deterioration; inherent vice; latent defect; mechanical breakdown; leakage of any chemical or petroleum product from a storage container; rust[.]

Shelter's adjuster testified the exclusion was found applicable after he spoke with the plumbing service that responded to the water problem and was told that "the galvanized pipe had rusted and failed."[15] He further testified that, absent evidence of "settlement," "that leaves only wear and tear, like I said, in the absence of anything else that could have possibly caused it." Shelter's claim supervisor further testified that given the explanation of wear and tear by the plumber, there was no need for additional examination of the premises to discover the cause of the break.

In its oral ruling, the trial court largely discussed the plumbing issue in the context of whether Shelter's investigation was adequate. The trial court further explained that his understanding of the adjuster's conversation with the plumber involved discussion of the water heater and that he talked "to him about what he saw, not what was under the slab."

The law is clear an "insurer bears the burden of proving that a loss falls within a policy exclusion." *Supreme Serv. & Spec. Co., Inc. v. Sonny Greer, Inc.*, 06-1827, p. 6 (La. 5/22/07), 958 So.2d 634, 639. Given this standard of review, we find no error in the trial court's ruling. It is clear that any discussion between the

---

[15] The adjuster also spoke about the plumber's replacement of the water heater. However, Ms. Mason did not pursue recovery of that item.

adjuster and plumbing service as to causation was speculative in nature as the slab was not broken to locate the source of the leak. Additionally, the plumber who responded to the incident explained in his deposition that he did not know what caused the break and further remarked that he did not know what type of pipe was underneath the floor. He specifically denied that he knew that the break was due to wear and tear. Simply, in light of this type of speculative causation, the record supports the trial court's conclusion that Shelter did not meet its burden of proving that the re-routing of the plumbing was excluded by the policy.

*Living Expenses*

Shelter also disputes the trial court's award of $750.00 "in future additional living expenses for hotel costs incurred during the course of repairs related to this claim[.]"[16] As it argued above with regard to the award of full restoration costs and asbestos abatement when the repairs had not been made, Shelter asserts that its policy offers coverage only for necessary expenses actually incurred, referencing the following language:

1.     What to Do In Case Of Loss

If a covered loss occurs, the **insured** must take all of the following actions if applicable to that loss:
. . . .

(g)     Produce receipts for any increased costs **you** incur to maintain **your** standard of living while **you dwell** elsewhere.

We find no merit in this claim. The subject language addresses a "covered loss." Shelter denied that coverage existed for the asbestos abatement, but by this argument simultaneously asserts that Ms. Mason was required to have the work performed, incurring increased costs for temporary relocation. However, Ms. Mason made demand on Shelter via this action, seeking money damages associated with the denial of coverage. In shaping a final judgment awarding such damages,

---

[16] Mr. Doherty and Mr. Viera both explained that Ms. Mason will not be able to live in the home while the asbestos abatement is performed.

the trial court correctly "indicate[d] the amount of recovery with certainty and precision." *Kimsey v. Nat. Auto. Ins. Co.*, 13-856, p. 5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1035, 1038. An award otherwise based on a future contingency does not constitute a proper judgment. *Id.*

*Deductible*

Shelter also seeks a reduction in the damages awarded due to the policy's $1,000.00 deductible. We will not modify the trial court's award as the record indicates that Ms. Mason's deductible was accounted for at the time that Shelter tendered its initial $924.85 payment for its estimate of the loss.[17]

*Penalties and Attorney Fees*

Both parties appeal the trial court's award of penalties and attorney fees. Initially, we will address Shelter's argument that the trial court erred in finding it was arbitrary and capricious in its adjustment of the claim. It maintains its adjuster relied upon the opinion of Ms. Mason's plumber regarding the wear and tear causation of the plumbing issue. It further suggests that it properly construed the language of its ordinance or law exclusion in rejecting Ms. Mason's claim for increased costs associated with asbestos abatement.

We find no abuse of discretion in the trial court's determination that penalties were appropriate. *See Sultana Corp. v. Jewelers Mut. Ins. Co.*, 03-0360 (La. 12/3/03), 860 So.2d 1112 (providing that the trial court's grant of penalties is

---

[17] On September 8, 2011, Shelter issued payment to Ms. Mason in the amount of $924.85. The exhibit in this regard includes correspondence dated September 7, 2011 in which the claims adjuster explained to Ms. Mason that:

> We have investigated your claim and estimated the amount of covered loss. That estimate is enclosed. We have also enclosed a draft, which is the actual cash value less your deductible. Here is how we arrived at this payment:

| | |
|---|---|
| Total Restoration Cost | $3,849.77 |
| Less: Depreciation | $1,924.92 |
| Less: Deductible | $1,000.00 |
| Less: Amount over the applied limit | $0.00 |
| Net Payment | $924.85 |

19

discretionary).  As discussed above, the record reveals the speculative nature of the conclusion that the plumbing issue was attributable to wear and tear or deterioration.  As for Shelter's denial of the asbestos removal claim, and although not cited by either the trial court or the parties, a previously reported case from this circuit rejected an insurer's argument that an ordinance or law exclusion relieved it of coverage for the removal of asbestos-containing flooring.  *Haas*, 722 So.2d 1022.

In her appeal, Ms. Mason seeks an increase in the quantum of the penalties and attorney fees.  By her motion to remand, Ms. Mason asks that this court return the matters of penalties, attorney fees, and various costs to the trial court for the entry of a greater penalty and for the introduction of evidence regarding attorney fees and costs.

In her petition, Ms. Mason cited both La.R.S. 22:1973 and La.R.S. 22:1892 in her request for penalties and attorney fees.  In pertinent part, the former statute permits the recovery of penalties for the failure to pay a claim in good faith as follows:

> A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing.  The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both.  Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
>
> B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A of this Section:
>
> . . . .
>
> (5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
>
> . . . .

20

C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.

La.R.S. 22:1973.

Additionally, Louisiana Revised Statutes 22:1892 provides for the payment of both penalties and attorney fees as follows:

A. (1) All insurers issuing any type of contract, other than those specified in R.S. 22:1811, 1821, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest. The insurer shall notify the insurance producer of record of all such payments for property damage claims made in accordance with this Paragraph.

. . . .

(4) All insurers shall make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim.

B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4) of this Section, respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2) of this Section when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, fifty percent of the difference between the amount paid or tendered and the amount found to be due as well as reasonable attorney fees and costs. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.

As these statutory provisions relate to the same misconduct by the insurer, the statute that permits the greater penalty supersedes the other. *Katie Realty, Ltd. v. Louisiana Citizens Prop. Ins. Corp.*, 12-0588 (La. 10/16/12), 100 So.3d 324 (citing

21

*Calogero v. Safeway Ins. Co. of Louisiana*, 99-1625 (La. 1/19/00), 753 So.2d 170).

In her argument to this court, Ms. Mason notes that the trial court awarded her a total of $23,341.96 (combining repair costs, plumbing costs, and relocation expenses)[18] and, thus, per La.R.S. 22:1892(B)(1), the penalty awarded should have been awarded in the amount of $11,670.98 as that is reflective of "fifty percent of the difference between the amount paid or tendered and the amount found to be due[.]"[19] She suggests that the trial court awarded the $10,000.00 penalty under the discretionary formula of La.R.S. 22:1973(C), which more generally describes the penalty available as "an amount *not to exceed* two times the damages sustained or five thousand dollars, whichever is greater." (Emphasis added.)

After considering both parties' respective arguments, we maintain the trial court's award of $10,000.00 in penalties. While Ms. Mason asserts that penalties were due for the entirety of the claim, the trial court's reasons for ruling addressed only the plumbing and the asbestos abatement issues. It did not state that it found Shelter's adjustment of the claim, in all regards, to be arbitrary and capricious. Thus, per the trial court's reasons, it appears that the penalty related to the awards for plumbing ($2,000.00) and costs associated with the asbestos removal ($5,400.00 per the Coastal Sales estimate and $750.00 for relocation expenses). If the formula of La.R.S. 22:1892(B)(1)("fifty percent of the difference between the amount paid or tendered and the amount found to be due") were used to calculate the penalty as urged by Ms. Mason, it would not exceed the $10,000.00 awarded pursuant to La.R.S. 22:1937. Thus, we will leave that award intact.

For the same reasons, we maintain the trial court's award of attorney fees, available upon a finding that failure to tender payment as required by La.R.S.

---

[18] We note that in her motion for remand, Ms. Mason takes account of the judgment's credit for payments previously made, whereas her appellant's and appellee's briefs do not.

[19] In her submissions to this court, Ms. Mason references both of La.R.S. 22:1892(B)(1)'s alternative awards of "fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater" and "fifty percent of the difference between the amount paid or tendered and the amount found to be due[.]"

22:1892(A)(1)-(4) was arbitrary, capricious or without probable case. *See* La.R.S. 22:1892(B)(1). While Ms. Mason suggests that the trial court erred in awarding $10,000.00 without accepting evidence, we observe that, at the time the trial court awarded that figure, she had not sought to introduce evidence regarding the appropriate amount. Rather, Ms. Mason's counsel simply requested "$65,000.00 in attorney fees" during closing argument. The trial court thereafter awarded $10,000.00, without objection on the record by Ms. Mason. Instead, by the partial motion for new trial, Ms. Mason sought a hearing for the introduction of evidence on the factors enunciated in *Covington v. McNeese State University*, 12-2182 (La. 5/7/13), 118 So.3d 343. The trial court denied that motion. Considering the particulars of that timeline, we find no abuse of discretion in that denial. Instead, Ms. Mason's counsel asked for attorney fees, in a specific amount, at the time of trial, but submitted no evidence at that time. Despite the lack of particular evidence, the trial court made that award, although not in the amount sought by Ms. Mason. We find no abuse of discretion in that figure based on the record before the court. *See Conner v. Bridgefield Cas. Ins. Co.*, 15-621, pp. 20-21 (La.App. 3 Cir. 12/9/15), 185 So.3d 754, 767 (explaining that "a trial court has the discretion to set the amount based upon its own knowledge, the evidence, and its observation of the case and the record"), *writ denied*, 16-0739 (La. 6/3/16), 192 So.3d 747. Accordingly, we cannot say the trial court abused its discretion in awarding $10,000.00 in attorney fees for the work performed at the trial level.

Ms. Mason filed her own appeal and requested additional attorney fees. "Generally, when an award for attorney's fees is granted at the trial level, additional attorney's fees are proper for work done on appeal. This is to keep the appellate judgment consistent with the underlying judgment." *Wilczewski v. Brookshire Grocery Store*, 08-718, p. 18 (La.App. 3 Cir. 1/28/09), 2 So.3d 1214, 1226, *writ denied*, 09-456 (La.4/13/09), 5 So.3d 170. After reviewing the record,

given the time and effort necessitated to successfully defend the judgment against the numerous assignments of error made by Shelter, we award $5,000.00 in additional attorney's fees for the work done on appeal.

Lastly, we find merit in Ms. Mason's assignment of error that the trial court erred in failing to award expert witness fees in this case. We note the judgment in this case broadly reflected that "defendant, Shelter Mutual Insurance Company, shall pay all court costs." However, by a "rule nisi pertaining to litigation and court costs," Ms. Mason sought a hearing for the assessment of expert witness fees pursuant to La.R.S. 13:3666 and various, particularized litigation expenses pursuant to La.R.S. 13:4533. The trial court denied that motion, which Ms. Mason again raises by her motion to remand.

Ms. Mason is seeking the deposition costs and expert witness fees under the provisions of La.Code Civ.P. art 1920, which provides that "Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause." Ms. Mason cites La.R.S. 13:3666 and La.R.S. 13:4533 as proof that the costs requested are authorized by statute. The law is clear that expert witness fees for testifying at trial and for time spent preparing for trial are recoverable. The trial court specifically stated there were no expert witness fees in this matter, though it would have awarded same if applicable. This is clearly error, as Ms. Mason called expert witnesses Paul Doherty and Raul Viera to testify during the trial. Moreover, David Prejean, who was deposed as an expert, had his deposition introduced in lieu of live testimony by agreement of the parties. Ms. Mason requested expert costs of $2,500.00 each for experts Paul Doherty and Raul Viera, and $1,500.00 in expert costs for David Prejean. Finding these costs to be reasonable, supported by the record, and recoverable under the law, we render these awards to Ms. Mason. We find no need to remand this matter to the trial court, and deny the Motion to Remand.

**DECREE**

For the foregoing reasons, the portion of the judgment denying Plaintiff, Alfrieda Onezime Mason's request for expert witness fees is reversed. We hereby award Plaintiff expert witness costs of $2,500.00 each for Paul Doherty and Raul Viera, and $1,500.00 in expert witness costs for David Prejean. Plaintiff is also awarded $5,000 in additional attorney fees for the work necessitated in defending Shelter's appeal. The Motion for Remand is denied. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed against Shelter Mutual Insurance Company.

**AFFIRMED IN PART; REVERSED IN PART AND RENDERED; MOTION TO REMAND DENIED.**

NUMBER 16-135

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA


ALFRIEDA ONEZIME MASON

VERSUS

SHELTER MUTUAL INSURANCE COMPANY

AMY, J., concurring in part and dissenting in part.

I join in the greater part of the majority opinion, including those aspects pertaining to insurance coverage and the quantum of damages, penalties, and attorney fees for work performed at the trial level. I further join in the denial of the motion to remand.

However, I respectfully dissent from the award, on appeal, of expert witness fees. While certain witnesses were qualified as experts, each largely offered fact testimony. To the extent opinion testimony was provided, it did not address the central issues at trial, which pertained to questions of coverage and contract interpretation. Notably, the trial court discounted the importance of any such testimony at the time of ruling, remarking that: "[u]sually we assess depositions and so forth towards court costs, and expert witness fees, or anything like that. I don't think we had any in this case." Additionally, I find that the plaintiff failed to substantiate those costs in the record. She rather only suggests the figures to be awarded in her brief to this court. Accordingly, I would leave the trial court's denial of those costs undisturbed.

Neither do I join in the award of attorney fees for work performed on appeal. Certainly, jurisprudence indicates that "[a]n increase in attorney's fees is awarded on appeal when the defendant appeals, obtains no relief, and the appeal has

necessitated more work on the part of the plaintiff's attorney, provided that the plaintiff requests such an increase." *Shailow v. Gulf Coast Soc. Serv.*, 15-91, pp. 13-14 (La.App. 3 Cir. 6/10/15), 166 So.3d 1239, 1249 (quoting *McKelvey v. City of DeQuincy*, 07-604, pp. 11-12 (La.App. 3 Cir. 11/14/07), 970 So.2d 682, 690), *writ denied*, 15-1336 (La. 10/9/15), 178 So.3d 1002, *writ denied*, 15-1355 (La. 10/9/15), 178 So.3d 1003. In this case, however, the plaintiff has not requested an award of attorney fees for work performed in defense of Shelter's appeal. Although the plaintiff filed her own appeal, she sought only an increase of attorney fees for work performed at the trial level. She makes no separate request—either in her appellee's reply to Shelter's appeal or in her own appellant's brief—for work performed in defense of Shelter's appeal. Absent that request, Shelter has not had an opportunity to respond to a distinct request for appellate attorney fees.

For these reasons, I would affirm trial court's ruling in full.